# THE GALLAGHER-WESTFALL GROUP
*Police Liability Management & Expert Witness Services*
*Leadership & Organizational Development*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### A Preliminary Report
### Frazier v. District of Columbia

### Prepared by:
### G. Patrick Gallagher

**I. Review of Background:**

I was contacted by Nicola Grey, and then by Richard Latterell who replaced her as defense counsel, both assistant attorney generals for the District of Columbia in 2007 and early in 2008, asking me to review this case file for **Frazier v. District of Columbia**. I agreed to undertake this assignment under my usual professional fee schedule which is as follows:

1. Case review at $200/hour;
2. Depositions away from my office at $2000 for any portion of the day plus all appropriate expenses for travel, meals, and accommodations;
3. Depositions at my office at $1000 for up to four hours, and $200/hour or any portion of the hour thereafter;
4. Court testimony at $2000 for any day or portion of that day, and for any day on site waiting to testify, plus all appropriate expenses for travel, meals, and accommodations.

**II. Qualifications for Frazier v. District of Columbia:**

For the past twenty-three years I have directed a company that has been involved exclusively with law enforcement agencies in dealing with:

-policies and procedures reviews;
-training in the major high risk/critical tasks (uses of force, emergency vehicle operations, critical incidents, and arrest);
-training of supervisors and managers especially as their roles and responsibilities relate to constitutional issues associated with 42 U.S.C. Sections 1983, 1985-86, and 1988;
-comprehensive liability or risk assessments of law enforcement agencies;
-management studies, departmental reviews, audits and inspections;
-expert witness services either for case review or for reports, depositions and court testimony.

G. Patrick Gallagher • P.O. Box 310 • Springtown, Pennsylvania 18081 • 610-346-6637 • FAX 610-346-6671

Given the size of the company (The Gallagher-Westfall Group) I personally have consistently provided by far the greater range of these services. During the course of this extensive experience in providing training, I have conducted an estimated four hundred and eighty training sessions mainly for law enforcement executives, managers, and supervisors concentrating heavily on the uses of force and arrest, pursuits, along with all of the relevant major issues relating to training, policies, supervision, and misconduct to include constitutional violations and the major case law pertinent to these issues. The training (and on many occasions the consultations with police departments) have gone far beyond risk management principles to include every manner of police operations, policies, and training.

This training has taken me to all 50 states, providing these services to individual departments, law enforcement training centers, risk management and insurance pools and their police department members, and finally a wide range of professional associations such as those for law enforcement, risk managers, and public officials.

Additionally I have provided training in policy development, policy implementation and policy training. I have been frequently called up to evaluate and review entire policy manuals, to critique their format, organization, style and especially their contents as well as the agency's efforts in training their executives, managers, and supervisory personnel in the substance of the policies in a wide variety of approaches.

I have authored training manuals on supervision, uses of force, pursuit, management, and leadership. I have authored nationally syndicated columns on police liability and the subjects of those columns have frequently been on uses of force and constitutional issues.

I have conducted close to 100 reviews/audits/assessments of law enforcement agencies reviewing their operations, practices, policies, supervision, training and discipline while directing a team of law enforcement professionals to evaluate and critique every aspect of a department to include internal affairs, investigations, and personnel functions. These management studies have been conducted for agencies ranging in size from 15 officers to 2500.

I have been involved in over 110 cases as an expert witness; about 55-60% has focused on use of force issues, both lethal and less than lethal and about 30-35% has involved pursuits with the remainder on arrests and other topics. I have been accepted as an expert in several federal districts and have testified in this district in Federal court on at least three other occasions.

I am also a co-director of the Legal and Liability Risk Management Institute which provides a continuum of training, expert witness, and audit services for law enforcement and corrections agencies and insurance and risk management pools while publishing a range of manuals and legal newsletters for law enforcement.

Previously I have held positions as:

    -Director of Police Standards and Training for the state of Florida in charge of the certification and training for all of the state's 35,000 officers, appointed by then governor and former U.S. Senator Bob Graham, reporting to an eighteen member Commission headed up by the state attorney general;

    -Director with the Florida Department of Law Enforcement;

    -Director of the Police Executive Institute, a national program in leadership and management development for law enforcement executives from the country's largest jurisdictions;

    -Director of Public Safety for the city of South Bend (IN) in charge of its 250 member police department and its 220 member fire department;

    -Consultant to the International Association of Chiefs of Police; the Police Executive Research Forum; the Federal Emergency Management Agency; the U.S. Department of Justice, Civil Rights Division, Special Litigation Section;

I have authored two books: **Behind the Uniform**, a study of comparative policing with Dr. Ian McKenzie, Superintendent, (ret.) London Metropolitan Police, and **Risk Management Behind the Blue Curtain: A Primer on Law Enforcement Liability**. I also have authored two columns circulated to law enforcement agencies throughout the country.

I received my B.A. from Marist College in Poughkeepsie, N.Y., my M.A. from N.Y.U., and completed my Ph.D. course work at Purdue University. I have taught various police and criminal justice administration courses at Indiana University, Golden Gate University, and American University.

Additional background information is available in my attached curriculum vitae.

**III-Documents Reviewed:**

  **1. Investigations and Reports:**

      1.1..Lt Douglas Investigation of Complaint, 10/9/03
      1.1. Investigation of Complaint, 10/22/2003
      1.2. Complainant Statement taken by Officer Willie Harris, 9/05/03
      1.3. Detective Williams Statement for Investigation, nd
      1.4. Mr. Frazier's Statement, 10/9/03
      1.5. Findings and Conclusions, 10/9/03
      1.6. Witness Statement of Officer Whitney of the GLLU, 10/8/03
      1.7. Witness Statement of Sgt. Butler, 9/17/08
      1.8. Witness Statement of Mr. Frazier, 9/18/03
      1.9. Affidavit for Warrant, 3/3/03
      1.10. Arrest/Prosecution Report, 3/3/03
      1.11. Lt. Douglas Memo to C.O., Supt. of Detectives, 11/4/03
      1.12. Disposition Sheet, Lt. Douglas, 10/11/03
      1.13. Incident Based Event Report, 2/18/03

    1.14. DOJ, USA, Plea Offer, 4/4/03
    1.15. Complaint Summary Sheet, 8/8/03
    1.16. Complaint Disposition Sheet, 11/11/03
    1.17. Lt. Douglas Findings in Sgt. Parson Complaint, 5/9/03
    1.18. Complaint Summary Sheet, Sgt. Parson v. Detective Williams, 8/13/03
    1.19. Affidavit in Support of Arrest Warrant, 3/3/03
    1.20. Shane Kline's Complaint, 2/16/03

2. Other Reports/Submissions:
    2.1. Consultant's Report, 7/11/07
    2.2. Mr. Frazier Memo to Sgt. Parson, 4/24/06
    2.3. Sgt. Parson Memo to C.O. Barrett, Supt's Office for Detectives, 4/16/03
    2.4. Affidavit in Support of Arrest Warrant, 4/1/03

**IV-Chronology of Events:**

| Date | Event |
|---|---|
| 2/17/03 | The incident at LaCage Club between Mr. Robert Frazer and Messrs. Jonathan Tart and Shane Kline takes place. |
| 2/17/03 | Mr. Frazer phoned Sgt. Parson stating he wanted to send in his own "incident report." |
| 2/17/03 | Frazer "incident report" is emailed to Parson who does not file a formal complaint presumably seeing it only as informational and background. |
| 2/18/03 | Kline assault complaint filed by Officer Harris after visit to club and identification of Marco, (aka Mr. Frazer) the dancer, whose photo was on the wall. |
| 3/05/08 | Detective Williams went to LaCage with Sgt. Parson who identified "Marco" as Mr. Frazer. |
| 3/07/3 | Detective Williams and Officer Whitney interviewed Mr. Frazer on this date according to Mr. Frazer |
| 3/08/03 | Detective Williams and Officer Whitney went to LaCage and interviewed Frazer according to Detective Williams |
| 4/01/03 | AUSA Worthington reviewed affidavit concerning Mr. Frazer's assault of Kline, and a warrant was issued. |
| 4/02/03 | Detective Williams called Mr. Frazer to tell him warrant had been issued. |
| 4/03/03 | Mr. Frazer turned himself in for arrest. |
| 4/04/03 | Sgt.Parson's call to AUSA Worthington resulted in *nolle prosequi* decision on her part. |
| 4/10/08 | Sgt. Parson sent email with concerns to Commander Barrett about Detective Williams' investigation. |
| 4/10/08 | Commander Barrett indicates that Sgt.Parson's allegations will have to be forwarded to the Office of Professional Responsibility (OPR). |

| | |
|---|---|
| 4/16/03 | Sgt. Parson inquired of Commander Barrett as to the status of the Williams investigation of what is now an official complaint initiated by Sgt. Parson against Detective Williams. |
| c. 5/-/03 | OPR assigns investigation of complaint to be performed by the manager of the investigative unit, i.e. Lt. Douglas, the unit in which Detective Williams worked. |
| 5/09/03 | Finding of "exonerated" in Sgt. Parson's complaint claiming "investigative concerns" against Detective Williams by Lt. Douglas. Sgt. Parson claimed that affidavit lacked information in Detective Williams' investigation of assault charge against Frazer. |
| 8/01/03 | Mr. Frazer filed his original (first) complaint. |
| 8/08/03 | Mr. Frazer's complaint was received at Office of Professional Responsibility. |
| 8/11/03 | Mr. Frazer complaint assigned to unit level investigation, Lt. Douglas with due date of 10/11/03. |
| 8/13/03 | Mr. Frazer filed an updated complaint basically containing the same charges according to Lt. Douglas. |
| 9/16/03 | Detective Williams notified by Lt. Douglas that PD 99 was filed against her. |
| 9/18/03 | Detective Williams re-interviewed Messrs. Kline and Tart. |
| 9/29/03 | Complaint about Sgt. Parson's statements to AUSA Worthington decided as "exonerated" in that Sgt.Parson had information that Detective Williams did not have. |
| 9/29/03 | Re-interview of AUSA Worthington for complaint filed by Mr. Frazer against Detective Williams |
| 10/09/03 | Lt. Douglas' interview of Mr. Frazer who mentioned updated complaint of August 13, 2003. |
| 10/11/03 | Mr. Frazer's complaint is classified as "unfounded." |
| 11/04/03 | Mr. Frazer submitted an updated complaint. |

**IV- Overview of the Incident:**

The incident started on the night and early morning of February 16-17, 2003 when Mr. Robert Frazier, an exotic dancer at the LaCage nightclub was involved in an incident with Mr. Shane Kline witnessed by Mr. Jonathan Tart.

As an employee of the club, in his role as that evening's exotic dancer, Mr. Frazier noted while performing that two patrons of LaCage were speaking to another dancer. Mr. Frazer apparently inferred they were criticizing his performance. When his turn on stage ended, Mr. Frazer confirmed his supposition by talking to the other dancer.

Mr. Frazer spoke to another member of the staff, Mr. T.J. Norris, the assistant manager, who also confirmed his observations, i.e. that Messrs. Kline and Tart were criticizing his performance. When Mr. Frazer attempted to approach the two men, they walked away, exhibiting a firm non-responsiveness and a distinct unwillingness

5

to converse with him. Despite these cues, Mr. Frazer followed them, since he still wanted to find out the cause of their "disparagement."

In Mr. Frazer's "incident report" of February 17th, he mentions that he talked with one of the assistant managers of LaCage, Mr. T.J. Norris, and in Mr. Frazer's own words, Mr. T.J. Norris immediately after the incident, said "he knew when I asked him what the complaint was, that I was going 'to do something' because he saw that I 'had that look in my eye.'" The "incident report" continues to say that Mr. Norris immediately called Steve, the manager of the club, presumably because he sensed that there would be some trouble.

**The Assault:** Mr. Frazer eventually confronted Messrs. Kline and Tart at the bar, where they were facing away from Mr. Frazer, who, according to Mr. Kline's statement, punched him in the back of the neck, a blow which he stated later required hospital treatment.

There is considerable dispute over the magnitude of the "blow" with Mr. Frazer stating it was merely a tap on the back. But it was indubitable that "an unwanted touching" took place. Mr. Tart as a witness, and Mr. Kline as the victim who had to go to the hospital, obviously perceived the "blow" with a closed fist as heavy and strong enough to effect some form of injury on Mr. Kline. Once the blow was delivered, Mr. Tart stepped in to protect his partner by pushing Mr. Frazer away.

**Filing of the Formal Police Complaint:** Mr. Kline filed a formal police report on the 17th of February. Subsequently, Officer Harris accompanied him to the club on that day where Mr. Kline identified Mr. Frazer (a.k.a. Marco) as the assailant. Officer Harris subsequently filed a simple assault report.

**Mr. Frazer's "Incident Report:"** It is apparent from internal evidence in the email from Mr. Frazer to Sgt. Parson, that in addition to this email directed to Sgt. Parson on February 17th, that these two individuals spoke on the phone "per our telephone discussions of today, Monday, 2-17-03." It appears that Sgt. Parson might have said something to Mr. Frazer about his willingness to "take this report,"(i.e. the incident report) which Mr. Frazer labeled an "Incident Report" but there is a question as to whether it was to be turned into a formal complaint.

Perhaps Sgt. Parson saw this email as informational while Mr. Frazer supposed it was the equivalent of a formal complaint. What is important is that no report was initiated on behalf of Mr. Frazer by Sgt. Parson.

If another complaint had been filed, this one by Mr. Frazer against Mr. Tart, then it would have been referred to the Gay and Lesbian Liaison Unit, with later referral to the First District Investigative Section for assignment to a detective, or possibly given to Detective Williams.

However, contrariwise, it was understandable that Sgt. Parson would take no further action because Mr. Frazer stated he did not want to report anything officially to the police so that "LaCage would not be exposed to any sort of negative incident report or action that might have garnered adverse publicity."

**No Formal Complaint and No Preliminary Investigation:** There was no preliminary investigation and certainly no follow-up investigation of a complaint filed by Mr. Frazer, until months after his subsequent arrest, because there was no formal complaint filed by Mr. Frazer prior to his arrest in early April.

**Detective Williams' Follow-up Investigation:**

Back in the First District, the case was assigned to Detective Williams. She ascertained the identity of the assailant because Officer Harris in taking the complaint from Mr. Kline, accompanied him to the club and Mr. Shane "pointed out the suspect on a picture hanging on the wall."

On March 5, 2003 when Detective Williams went to the club with Sgt. Parson who identified "Marco" as Mr. Frazer. Steve, the manager, told Mr. Frazer when he came in for his weekend performances, the police needed to speak to him about the report that had been filed. Mr. Frazer still could have filed a formal police complaint, but he did not.

From the photo and ascertaining Mr. Frazer's schedule for appearances, it was then necessary to return on a weekend night when Marco, the dancer (a.k.a. Mr. Frazer) was appearing.

On a Friday night, March 8, 2003, Detective Williams and Officer Whitney went to the club. At this critical point, Mr. Frazer admitted to "pursuing them (Messrs. Kline and Tart) twice, they refused to talk to me, after the second time I tapped turtleneck (Kline) in the back of the neck, <u>for making negative comments that interfered with my moneymaking ability at the club.</u>" (The touching or the blow was administered to the neck of Mr. Kline not to get his attention, but for "making negative comments that interfered with my moneymaking ability at the club.")

Detective Williams then interviewed the victim and the witness, who admitted after the blow to Mr. Kline's head, he pushed the assailant away from Mr. Kline to stop the assault..

Detective Williams with a formal complaint, a witness and the statements of Mr. Frazer, was objectively justified in her behavior with the approval of a supervisor in the investigative section to write up the affidavit and seek the approval of AUSA Worthington for an arrest warrant which she issued on April 1, 2003. Through subsequent communications between Detective Williams and Mr. Frazer, he agreed to surrender himself on April 3, 2003.

**Additional Complaints:**

Months later after the arrest and the *nolle prosequi* dropping the charges, Mr. Frazer submitted a complaint against the manner and quality of the investigation conducted by Detective Williams, a complaint investigated by the Metropolitan Police Department, claiming in part that he was assaulted by Mr. Tart. The complaint claimed Detective Williams had conducted a "flawed and incompetent investigation." It was classified as "unfounded."

Detective Williams filed an internal complaint against Sgt. Parson for his "interference" in her case, occasioned when he contacted AUSA Worthington directly to state facts known to him concerning Mr. Frazer and his encounter with Messrs. Tart and Kline.

On April 10, 2003 Sgt. Parsons filed an internal complaint against Detective Williams focusing on the quality of her investigation of the criminal complaint against Mr. Frazer.

These complaints investigated by the unit supervisor (Lt. Douglas) were found to be classified as either "exonerated," i.e. it took place but there was nothing wrong with the actions of the office or "unfounded," i.e. the action complained against did not take place.

**IV-Opinions:**

> **1. The investigative actions of Detective Williams met the minimum standards for the development of an affidavit for an arrest warrant for Mr. Frazer.**

The basic scrutiny of the case file must center on the actions, decisions, and conclusions made by Detective Williams leading up to her submission of an affidavit for the arrest of Mr. Frazer on the charge of simple assault, and the subsequent arrest of Mr. Frazer.

Through the basic academy, Detective Williams would have been schooled in the essential elements of the offense of simple assault. The basic academy for new officers would have presented them with the elements in 404 of the D.C. Code concerning the misdemeanor offense of simple assault, e.g. attempted-battery assault which are as follows:

> 1. The defendant made an attempt or effort, with force or violence, to injure another person;
> 2. The time the defendant made that attempt of effort, he had the apparent present ability to injure that person;
> 3. The defendant made the attempt or effort voluntarily and on purpose, not by mistake or accident;

> 4. The defendant's conduct was not justified by the use of reasonable parental discipline.

Mr. Kline made a complaint against Mr. Frazer on February 17, 2003 alleging that he was punched with a closed fist on the back of his head, after he and his companion, Mr. Tart were followed around the bar by Mr. Frazer, who, by his own admission wanted to confront the two of them with questions about their conduct and comments during his stage performance.

Officer Harris conducted the preliminary investigation of the complaint, escorting Mr. Kline to the club, interviewing some people, and getting the identity of the alleged assailant, Mr. Frazer (a.k.a. Marco).

**Processing and Assigning the Assault Report:**

In considering all the events, it is critical to understand that according to the Metropolitan Police Department procedures, given the nature of the case relating to incidents in which gay or lesbian individuals are involved, it is forwarded to the Gay and Lesbian Liaison Unit (GLLU) whose commanding officer at that time was Sgt. Parson.

Since the GLLU had no investigative resources, it was then transferred to the First District Detective Section for follow-up. At this point, the GLLU was now out of the case, and it was not expected for them to become involved in any follow-up. So a preliminary investigation had taken place, the formal complaint made, the report was directed to the GLLU, and that same report was then transmitted for follow-up investigation to the First District Detective Section.

A supervisor presumably assigned the case to Detective Williams for follow-up investigation. She was expected to interview the victim and witness(es), interview the alleged subject if known and make appropriate decisions about the process of going forward. Detective Williams took these actions, and it would be perfectly appropriate for her to use her discretion to conclude that the investigation was as complete as needed. One of the most important factors had to be the statements of Mr. Frazer himself which led her to say to Mr. Frazer:

> "his behavior, i.e. following the complainant in the club aggressively, tapping him, annoying them with his remarks/comments and any unwanted touching constituted an assault."

So having gathered these facts, having heard the statements of the subject which in effect was self-incriminating, factoring in her training and experience of twenty years of service would lead her to conclude that there was sufficient proof for probable cause for the arrest of Mr. Frazer.

Detective Williams in her affidavit submitted to AUSA Worthington indicated that Mr. Frazer "walked over to the complainant (Mr. Kline) and struck him in the back of the neck with a closed fist," which necessitated hospital treatment. According to the affidavit, Mr. Frazer stated: "he assaulted the complainant because he was talking negatively about his dancing" interfering with his money making abilities in LaCage Club. It was apparently an admitted assault freely undertaken for a specific reason by Mr. Frazer. These facts constituted the probable cause necessary for an affidavit and arrest warrant. In Lt. Douglas' investigation of Mr. Frazer's complaint submitted in August 1, 2003, the investigator interviewed AUSA Worthington in this matter who indicated, according to Lt. Douglas' report,

> "that any unwanted touching of another individual is a simple assault and that Detective Williams did have probable cause."

She then produced for Lt. Douglas a copy of her arrest warrant review and her signed affidavit.

Was Detective Williams justified in concluding that an assault had taken place?

- On April 3, 2003 Mr. Frazer surrendered for his arrest and demanded to speak to a supervisor, Sgt. Butler to whom he admitted that" he should not have put his hand on the subject and he agreed that he had made a mistake."

- On March 8, 2003 Officer Whitney accompanied Detective Williams to the LaCage Club to interview Mr. Frazer. Officer Whitney's report indicated that Mr. Frazer had struck first; Frazer disagreed but did admit that he tapped the back of the victim first. In effect he was the primary aggressor.

- On March 8, 2003 Detective Williams interviewed Mr. Frazer at the LaCage Club indicating that Mr. Frazer: "hit him (Kline) after they (Messrs Tart and Kline) made disparaging remarks about my dancing to the employees of the club."

- Mr. Frazer is also quoted as saying that: "I followed them throughout the club and tried to engage them in conversation, to find out why they were talking about me. I pursued them twice and they refused to talk to me. After the second time I tapped 'turtleneck' (Kline) in the back of the neck for making negative comments that interfered with my moneymaking ability at the club."

It does seem that Mr. Frazer's attitude, noticed by Mr. T.J. Norris, caused him to touch/strike Mr. Kline because he felt that his source of income was threatened, not so much to merely discuss their opinions of his performance.

Working within the four corners of the formal complaint, Detective Williams assembled the necessary factors: victim and his statements, witness, and the very words of the subject which could be considered a confession to the act of assault.

There is no precise standard in policing for a follow-up investigation. In an event of obvious criminality where there are multiple witnesses, the investigation would of necessity include interviews with as many witnesses as possible to ferret out a suspect if one is not immediately known, or to describe the actions of the known suspect as to whether or not he/she committed the alleged crime. The present incident and its factual basis had little need of ranging far afield, thus obviating the need to gather statements of witnesses, since the subject, Mr. Frazer, openly admitted to the "unwanted touching."

**Conclusion: Detective Williams' investigation of the criminal complaint filed by Mr. Kline met the minimum standards for a follow-up investigation and was appropriate for submission for an arrest warrant after presentation of a signed affidavit.**

**N.B. This report is to be considered preliminary and the reviewer reserves the right to amend the report and the opinions based on the submission of additional materials and documents which might change facts, or allow for different conclusions. In the absence of any further submissions or in the presentation of documents that merely reinforce what has already been submitted, then the opinions and the report would stand as presented above.**

Signed _/s/ Patrick Gallagher_
G. Patrick Gallagher
March 28, 2003